UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

KENNETH WARREN FORD,
    Plaintiff,

v.                            Case No.: 3:24cv570/MW/ZCB

CHRISTOPHER HUGHES, et al.,
    Defendants.
_____/

## REPORT AND RECOMMENDATION

This is a *pro se* prisoner civil rights case filed under 42 U.S.C. § 1983. Defendants have moved to dismiss (Doc. 53), and Plaintiff has responded in opposition (Doc. 61). For the reasons below, Defendants' motion should be denied.

### I.    Summary of Plaintiff's Factual Allegations

Plaintiff's second amended complaint names three employees of the Florida Department of Corrections as Defendants: (1) Captain Christopher Hughes; (2) Lieutenant Christy Wheaton; and (3) Major Charles Richter. Plaintiff sues Defendants in their individual capacities. (Doc. 40 at 2-3).

On August 31, 2021, at Santa Rosa Correctional Institution, Plaintiff was on close management status when he was ordered to move

1

to a new cell. Plaintiff states that close management inmates are separated from the general prison population for security reasons, and he alleges that Defendants know the close management procedures for dangerous inmates. (*Id.* at 5-6).

When Plaintiff arrived at his new cell, he was told he would have to move again. Plaintiff was then taken to a different cell to be housed with inmate Joseph McNeil. McNeil was on close management for "a pattern of predatory actions which makes [him] a threat to others." Plaintiff claims McNeil was frequently disciplined for threats, battery on inmates, and stabbing his cellmates. Plaintiff alleges that Defendants, through personal involvement, were aware of McNeil's reputation for stabbing his cellmates and the risk of harm he posed to other inmates. (*Id.* at 6-7).

Two non-party officers who moved Plaintiff also knew of McNeil's violent reputation and the risk Plaintiff faced if housed with McNeil. The two officers called Defendant Hughes about the situation. When Defendant Hughes arrived, he allegedly said he was "not with his bullshit today" while walking toward McNeil's cell. Several inmates warned Defendant Hughes about McNeil stabbing his prior cellmates, but

2

Defendant Hughes merely "looked agitated while shaking his head[.]" (*Id.* at 7).

Once Plaintiff arrived at McNeil's cell, McNeil told Defendant Hughes that Plaintiff was not coming in and "if you put him in here, it's gonna be problems." Other inmates continued warning Defendant Hughes not to put Plaintiff in McNeil's cell. Despite hearing these warnings, Defendant Hughes allegedly said, "oh he's coming in there . . . you don't run nothing inmate!" McNeil then said, "I will stab [Plaintiff] like I did my bunky before if you put him in here with me!" Other inmates continued warning Defendant Hughes of the danger of placing Plaintiff in the cell with McNeil. (*Id.* at 8-9).

Defendant Hughes allegedly looked at Plaintiff and McNeil to size up the two inmates. McNeil showed Defendant Hughes his stabbing-related disciplinary reports and said, "you know me and what I will do . . . so you better do your paperwork and find that dude another cell." Defendant Hughes responded by saying that he was going to "gas" McNeil for refusing to allow Plaintiff into the cell. Plaintiff was taken to a holding cell as Defendant Hughes ordered other officers to prepare to use chemical agents on McNeil. Before the chemical agents were used,

3

however, McNeil relented and agreed to allow Plaintiff to enter the cell. Defendant Hughes threatened to use chemical agents on inmate McNeil until Plaintiff was fully inside the cell. An officer then escorted Plaintiff to the front of McNeil's cell. (*Id.* at 9-10).

At the front of the cell, McNeil questioned Plaintiff about his sexuality and close management status. Plaintiff told Defendant Hughes that the two inmates were incompatible due to their different close management statuses. Another inmate protested to Defendant Hughes about putting Plaintiff in McNeil's cell. But Defendant Hughes responded that Plaintiff was going into the cell. Defendant Hughes then ordered Plaintiff to enter McNeil's cell. (*Id.* at 10-11).

Prior to cell inspection on September 1, 2021, several inmates told Plaintiff they would inform the inspecting officers about McNeil and the risk he posed to Plaintiff. While Defendants Richter and Wheaton were inspecting cells, another inmate told them about McNeil's history of stabbings and told them Plaintiff could get killed by being placed with McNeil. Defendant Richter told Plaintiff his concerns would be addressed after cell inspection ended. Defendants Richter and Wheaton continued the inspection. Defendant Wheaton allegedly told other

inmates that the two already knew about the issue involving McNeil and Plaintiff. (*Id*. at 11-13).

Plaintiff alleges that he told Defendants Richter and Wheaton that McNeil had threatened him, and Plaintiff requested a move for safety reasons. Defendant Richter responded that the two inmates' close management statuses did not matter and that if Plaintiff thought otherwise, he needed to "write it up." Defendant Wheaton listened to this response but said nothing. McNeil then approached the cell door and told Defendant Richter that he had mental health issues and needed to be housed alone. Defendant Wheaton then told McNeil to "stop being a bitch" before she walked away from the cell with Defendant Richter. (*Id*. at 13).

On the evening of September 2, 2021, an officer prepared to take Plaintiff and McNeil to the showers. McNeil put his hands through the cell's food flap to be handcuffed. After his left wrist was cuffed, McNeil pulled back his hands. He then used the handcuffs to beat Plaintiff in the head eight to ten times. The officer used chemical agents to stop McNeil's assault on Plaintiff. Plaintiff alleges he suffered cuts, swelling, severe pain, and scarring from McNeil's attack. (*Id*. at 14).

5

Plaintiff asserts Eighth Amendment failure to protect and deliberate indifference claims against Defendants regarding the attack by McNeil. (*Id.* at 15-17). For relief, Plaintiff seeks monetary damages. (*Id.* at 17-18).

## II.   Motion to Dismiss Standard

Defendants have moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. To survive dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The plausibility standard is met only where the facts alleged enable "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility means "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up).

At the motion to dismiss stage, the Court accepts the allegations in the complaint as true and construes them in the light most favorable to

6

the plaintiff. *McClinton v. Warden, Baldwin State Prison*, 172 F.4th 1276, 1281 (11th Cir. 2026). Additionally, a *pro se* plaintiff's complaint must be liberally construed. *Danglar v. Dep't of Corr.*, 50 F.4th 54, 56 n.4 (11th Cir. 2022).

## III.  Discussion

**Defendants are not entitled to qualified immunity.**

In their motion, Defendants seek dismissal based on qualified immunity. (Doc. 53 at 14-36). Although qualified immunity is "typically addressed at the summary judgment stage of a case, it may be raised and considered on a motion to dismiss." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (cleaned up). To overcome qualified immunity at the motion to dismiss stage, "the operative complaint must plausibly plead that [1] the defendant violated the plaintiff's federal rights and [2] those rights were clearly established." *Jackson v. City of Atlanta, Ga.*, 97 F.4th 1343, 1350 (11th Cir. 2024).[1]

---

[1] It appears to be undisputed that Defendants were performing a discretionary duty, so no analysis of that portion of the qualified immunity test is required. *See Charles v. Johnson*, 18 F.4th 686, 698 (11th Cir. 2021) (stating that no analysis of discretionary duty was required because the issue was undisputed).

7

## A. The violation of a federal right

The Court will first discuss whether Plaintiff has plausibly alleged that Defendants violated a federal right. Plaintiff claims Defendants violated the Eighth Amendment, which "requires prison officials to take reasonable measures to guarantee the safety of the inmates." *Cox v. Nobles*, 15 F.4th 1350, 1357 (11th Cir. 2021) (cleaned up). This "duty to protect encompasses protecting prisoners from violence at the hands of other prisoners." *Id.* (cleaned up). But prison officials do not violate the Eighth Amendment by a "merely negligent failure to protect an inmate from attack" by another inmate. *Marbury v. Warden*, 936 F.3d 1227, 1238 (11th Cir. 2019). And not "every injury suffered by one prisoner at the hands of another" leads to "liability for prison officials responsible for the victim's safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

A prisoner asserting an Eighth Amendment failure to protect claim must plausibly allege three elements: (1) the inmate faced a substantial risk of serious harm; (2) prison officials acted with deliberate indifference to that risk; and (3) causation. *Cox*, 15 F.4th at 1357-58. Each element will be discussed below.

### 1. Substantial risk of serious harm

The substantial risk of serious harm element is assessed "objectively," and it requires conditions that were "sufficiently serious" to violate the Eighth Amendment. *McClinton*, 172 F.4th at 1282. The Eleventh Circuit has "recognized that inmate-on-inmate violence can amount to serious harm." *Scott v. Miami Dade Cnty.*, 657 F. App'x 877, 881 (11th Cir. 2016). But threats of violence from one inmate to another inmate are, by themselves, typically insufficient to show "a substantial risk" of serious harm. *Marbury*, 936 F.3d at 1236. Instead, there must be something more from which "a prison official could have concluded that a particular threat evidenced a substantial threat, rather than the mere possibility, of serious harm." *Id.* Put another way, an inmate can establish a "substantial risk of serious harm where he has given prison officials further information enabling them to conclude that the risk was substantial and not merely possible." *Id.*

Here, Plaintiff has plausibly alleged a substantial risk of serious harm. Plaintiff has alleged that all three Defendants were aware of McNeil's well-known history of harming his cellmates. (Doc. 40 at 7). As to Defendant Hughes specifically, multiple inmates allegedly warned him

9

that Plaintiff was in danger if housed with McNeil because of McNeil's history of stabbing his cellmates. (*Id.* at 7-8, 10-11). Indeed, McNeil himself allegedly told Defendant Hughes that Plaintiff was "not coming in . . . and if you put him in here, it's gonna be problems." (*Id.* at 8). McNeil subsequently repeated this warning to Defendant Hughes when he allegedly said, "I will stab him like I did my bunky before if you put him in here with me!" (*Id.*). It was only after McNeil was threatened with chemical agents that he relented and allowed Plaintiff into his cell. (*Id.* at 10). After being put in the cell with McNeil, Plaintiff told Defendant Hughes that he was not compatible with McNeil and needed to be moved. (*Id.*).

As to Defendants Richter and Wheaton, other inmates told them about McNeil's prior stabbings and the risk Plaintiff faced if housed with McNeil. (*Id.* at 11-13). One inmate allegedly told Defendants Richter and Wheaton that McNeil had threatened to stab Plaintiff if he was put in McNeil's cell—a statement Plaintiff confirmed to Defendants Richter and Wheaton. (*Id.* at 12-13). With Defendant Wheaton listening, Plaintiff told Defendant Richter that inmate McNeil threatened to stab him and that he needed to be moved for safety reasons. (*Id.* at 13).

10

Moreover, McNeil allegedly told Defendants Richter and Wheaton that he needed to be housed alone because he and Plaintiff were incompatible. (*Id.*).

These allegations, accepted as true, plausibly show a substantial risk of harm because Plaintiff has alleged "more than some unspecified risk of harm." *Nelson v. Tompkins*, 89 F.4th 1289, 1297 (11th Cir. 2024) (cleaned up). Given the allegations that McNeil had a known (and recent) history of stabbing his cellmates, that McNeil had specifically threatened to harm Plaintiff if he was placed in the cell, and that multiple people informed Defendants of their concerns about Plaintiff's safety, Defendants had enough information "to conclude that the risk was substantial and not merely possible." *Marbury*, 936 F.3d at 1236.

This is not a case involving a speculative possibility of a future attack. Nor is it one involving a vague threat to an inmate by his cellmate. It is, instead, a case with a specific threat made by a violent inmate that was reported to prison officials—by Plaintiff, other inmates, and by McNeil himself—and ignored by prison officials shortly before Plaintiff was assaulted by McNeil. *See Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 618-19, 620-22, n.17 (11th Cir. 2007) (finding a

11

substantial risk of harm where prison officials were "verbally informed . . . on at least two occasions that [the plaintiff's] life had been threatened by members of his former gang and that, to avoid injury, he needed . . . to be transferred"); *see also Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1322 (11th Cir. 2016) ("Deputy Warden Underwood and Officer Davis . . . knew *specifically* that [Merkerson] had committed a 'High–Assault' against his previous cellmate and that the assault had precipitated his transfer and segregation in Unit K–3. Far from a generalized awareness of Merkerson's propensity to misbehave, this allegation indicates a degree of specificity in the risk of harm posed to Mr. Bowen that simply was not present in *Carter*."). Accordingly, Plaintiff has plausibly alleged a substantial risk of serious harm. *See Webb v. Warden*, No. 4:12cv308, 2014 WL 50742, at *1 (N.D. Fla. Jan. 7, 2014) (declining to dismiss claim where plaintiff alleged that prior to the attack, prison records showed the attacker was a safety threat, had a history of attacking other inmates, was classified as high risk, and that prison officials were aware of his violent record when he was placed into a prison dormitory with inmates of a different safety classification).

## 2. Deliberate indifference

The Court will now turn to the second element, which is deliberate indifference.  Deliberate indifference requires the plaintiff to plausibly allege subjective recklessness, which means "that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff . . . ."  *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc).  Subjective recklessness "must be based on more than a generalized or abstract knowledge of a danger to the prisoner; the official must be aware of a specific risk."  *McClinton*, 172 F.4th at 1283.  In other words, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 1284.

Here, Plaintiff has plausibly alleged facts sufficient to satisfy that standard. As mentioned above, Plaintiff alleges that he and other inmates warned Defendants about McNeil's history of stabbings and the risk Plaintiff faced by being housed with him.  Defendant Hughes was told by Plaintiff, other inmates, and McNeil himself that Plaintiff was in danger if housed with McNeil.  Defendants Richter and Wheaton were told by Plaintiff and other inmates about McNeil's violent past, the risk

13

Plaintiff faced, and McNeil's threat to harm Plaintiff if he was placed in McNeil's cell.  And prior to these concerns being raised, all three Defendants were allegedly aware of McNeil's history of violence directed at his cellmates.

These allegations are sufficient to plausibly state that Defendants knew of a substantial risk of harm to Plaintiff.  *See Rodriguez*, 508 F.3d at 618-19 (finding inmate testimony that he informed defendants of threats and requested to be placed in protective custody was sufficient to create a triable issue regarding deliberate indifference); *see also Bowen*, 826 F.3d at 1324 (concluding an inmate plausibly alleged deliberate indifference where prison officials allegedly "*knew* the troubling details of Merkerson's severe mental condition; they *knew* of his recent assault against his cellmate; and they *knew* that, under the Placement Guidelines, he should have been housed alone" and allegedly "were *actually aware* of a substantial and seemingly conspicuous risk posed to [the plaintiff] by allowing him to remain in the small cell with Merkerson").

Although a defendant who knew of a substantial risk "cannot be found liable . . . if he 'responded reasonably to the risk,'" *Wade*, 106 F.4th

at 1262, here Plaintiff has plausibly alleged that Defendants' response was unreasonable. "An official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly declined to act or if he knew of ways to reduce the harm but recklessly declined to act." *Rodriguez*, 508 F.3d at 620 (cleaned up). If Plaintiff's allegations are proven true, a reasonable jury could conclude that Defendants unreasonably responded by leaving Plaintiff in the cell with McNeil.[2]   *See Scott*, 657 F. App'x at 883-84 ("Assuming that Defendants did nothing, or next to nothing, in response to the threats that Plaintiff had received, a jury could find that Defendants did not respond reasonably to the substantial risk of serious harm Plaintiff faced."); *see also Jenkins v. Soder*, No. 4:22cv268, 2023 WL 3026001, at

---

[2] Defendants argue that they responded reasonably by relying on prison housing officials' decision to place Plaintiff and McNeil together and that housing disputes are not appropriate for a court to resolve. (Doc. 53 at 26-28). Even if housing assignments are generally within prison officials' discretion, that does not preclude a finding of unreasonableness where prison officials learned new information after a housing decision was made. The case cited by Defendants in support of this argument is factually distinguishable. In the cited case, the statement regarding prison officials' discretion in housing assignments was made in the context of a prisoner seeking a transfer to a different prison closer to his home, not a prisoner asking to be moved to a new cell out of fear for his safety. *See Cordovano v. Dep't of Corr.*, No. 4:14cv8, 2014 U.S. Dist. LEXIS 24391, at *1-5 (N.D. Fla. Jan. 23, 2014).

*4 (N.D. Fla. Mar. 21, 2023) ("Given the notice of the substantial and particularized threat, it was unreasonable for Soder to leave Allahad unattended without restraints in Jenkins' vicinity on the same day.").

### 3. Causation

The third element requires that the plaintiff plausibly allege a causal connection "between the officer's failure to act reasonably and the plaintiff's injury." *Marbury*, 936 F.3d at 1233. Although Defendants do not appear to dispute this element, it is apparent that Plaintiff has plausibly alleged causation. He has alleged a direct causal connection between Defendants' failure to take steps to protect him and the injuries he sustained from the attack by McNeil.

Because Plaintiff's factual allegations—when accepted as true and liberally construed—are sufficient to state the three elements of an Eighth Amendment failure to protect claim, he has plausibly alleged that Defendants violated his Eighth Amendment right. The Court will now turn to the second step of the qualified immunity analysis, which is determining whether the right was clearly established.

**B. The right was clearly established.**

For purposes of the qualified immunity analysis, "the relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Caldwell v. Warden*, 748 F.3d 1090, 1102 (11th Cir. 2014) (cleaned up). There are three ways that a right can be clearly established: (1) a Supreme Court or Eleventh Circuit case "with indistinguishable facts clearly establishing the constitutional right"; (2) a broad legal principle "within the Constitution, statute, or case law that clearly establishes a constitutional right"; or (3) the acts committed were "so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Edwards v. Grubbs*, 169 F.4th 1261, 1278-79 (11th Cir. 2026).

In the current case, the Court finds that the right Defendants allegedly violated was clearly established in the second way because "the broad principles of [the Eleventh Circuit's] deliberate indifference precedents clearly control" the alleged facts here. *Nelson*, 89 F.4th at 1299. The "broad-principles category encompasses situations in which [the Eleventh Circuit's] case law has sufficiently established a constitutional right that every reasonable officer would know his conduct

17

was unlawful despite the fact that [the Eleventh Circuit] hadn't yet applied the principle to the specific facts of his case." *Jarrard v. Sheriff, Polk Cnty.*, 115 F.4th 1306, 1324 (11th Cir. 2024). Thus, the Court need not "parse out whether any" prior cases "involved indistinguishable facts or circumstances." *Id.* Instead, a principle is clearly established if the Eleventh Circuit has "affirmed it in a variety of situations." *Id.*

At the time of the alleged attack by McNeil, the Eleventh Circuit had recognized that there is a clearly established broad principle that "prison officials have a duty under the Constitution to take reasonable action to protect prisoners from violence at the hands of other prisoners[,]" and that "an officer violates this duty if he knows that one prisoner poses a substantial risk of harm to another, yet fails to take any reasonable action to separate them." *Nelson*, 89 F.4th at 1299 (cleaned up); *see also Caldwell*, 748 F.3d at 1102 (finding it clearly established that "a prison guard violates a prisoner's Eighth Amendment right when that guard actually (objectively and subjectively) knows that one prisoner poses a substantial risk of serious harm to another, yet fails to take any action to investigate, mitigate, or monitor that substantial risk of serious harm"). That clearly established broad principle covers the facts alleged

18

by Plaintiff here. Plaintiff has plausibly alleged that Defendants knew McNeil posed a substantial risk of harm to Plaintiff. Yet Defendants allegedly did nothing to mitigate that risk or protect Plaintiff from it. The precedent cited above was sufficient to provide notice to Defendants that their conduct was unlawful.[3]

For the reasons above, the allegations in Plaintiff's second amended complaint are sufficient to overcome Defendants' assertion of qualified immunity.[4] As such, dismissal is unwarranted. The Court emphasizes

---

[3] Defendants argue that *Nelson* is distinguishable from the allegations here. (Doc. 53 at 32-35). The Court, however, is not relying on *Nelson* under the "indistinguishable facts" method of showing a clearly established right. The Court instead is relying on the broad principle recognized in *Nelson* and other Eleventh Circuit cases holding that a prison official has a duty "to take reasonable action to protect prisoners from violence at the hands of other prisoners" and violates that duty "if he knows that one prisoner poses a substantial risk of harm to another, yet fails to take any reasonable action to separate them." *Nelson*, 89 F.4th at 1299 (cleaned up).

[4] Defendants argue that the Eleventh Circuit's pre-*Wade* "flip-flopping" on the precise mental state required for deliberate indifference means it was not clearly established that Defendants' actions were unconstitutional in 2021. (Doc. 53 at 36). Defendants' argument is unpersuasive given the Supreme Court's adoption and explanation of the subjective recklessness standard for failure to protect cases some thirty years prior to *Wade* in *Farmer v. Brennan*, 511 U.S. 825 (1994). Although there might be something to the argument advanced by Defendants in the context of deliberate indifference to serious medical needs cases, the Court does not believe there is anything to the argument in the context of failure to protect claims like those raised by Plaintiff today. *See*

that this determination is being made at the motion to dismiss stage, which requires the Court to accept the factual allegations in Plaintiff's second amended complaint as true. Discovery may show that what really happened is different from what Plaintiff says happened. And if that is the case, then Defendants are free to raise the defense of qualified immunity again in a motion for summary judgment.

## IV.   Conclusion

For the reasons above, it is respectfully **RECOMMENDED** that:

1.   Defendants' motion to dismiss (Doc. 53) be **DENIED**.

2.   This case be recommitted to the undersigned for further proceedings.

At Pensacola, Florida this 20th day of May 2026.

/s/ *Zachary C. Bolitho*
Zachary C. Bolitho
United States Magistrate Judge

---

*McClinton v. Barry*, No. 5:22cv109 (MTT), 2025 WL 491992, at *6 (M.D. Ga. Feb. 13, 2025) (recognizing that *Wade* may be problematic for earlier deliberate indifference to medical needs cases but explaining that it was not problematic for failure to protect cases because "*Farmer* involved a failure to protect claim and courts tend to hew more closely to *Farmer* in failure to protect cases"), *aff'd*, 172 F.4th 1276 (11th Cir. 2026).

## Notice to the Parties

Objections to the proposed findings and recommendations set forth above must be filed within fourteen days of the date of this Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control</u>. An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.